# CIRCUIT COURT OF BALTIMORE CITY.

Filed September 13, 1912.

J. LIVINGSTON MINIS, ET AL.,
VS.
THE PENNSYLVANIA R. R. CO., ET AL.

*A. W. Machen, Jr.,* for plaintiff.

*Willis & Homer, B. Carter & Sons* and *John J. Donaldson* for defendants.

HARLAN, C. J.—

The bill of complaint which was filed in this case on the 13th day of October, 1910, by certain minority stockholders of the Northern Central Railway Company seeks to set aside a so-called sale of 5,000 shares of stock of the Union Railroad Company of Baltimore, made by the directors of the Northern Central Railway Company to the Philadelphia, Wilmington and Baltimore Railroad Company in February, 1894, and have the stock together with 3750 additional shares of stock acquired as a stock dividend on said 5,000 shares retransferred to the Northern Central Railway Company by the Philadelphia. Baltimore and Washington Railroad Company, a road formed by the consolidation of the Philadelphia, Wilmington and Baltimore Railroad Company and the Baltimore and Potomac Railroad Company in 1902, and to have the latter road account and pay over to the Northern Central Railway Company

all cash dividends received by the Philadelphia, Baltimore and Washington Railroad Company or its predecessors, the Philadelphia, Wilmington and Baltimore Railroad Company on said 5,000 shares and said additional 3,750 shares of stock of the union Railroad Company, the Northern Central Railway Company restoring to the Philadelphia, Baltimore and Washington Railroad Company the price paid to it for the 5,000 shares of stock of the Union Railroad Company, viz., $550,-000.00, together with legal interest from the date of said payment, and that all such cash dividends may be decreed to be distributed and paid among the stockholders of the Northern Central Railway Company.

The grounds upon which the so-called sale by the Directors of the Northern Central Railway Company is attacked are that it was fraudulent in law and ultra vires, and that the vendee was a participant in the wrong committed upon the stockholders of the Northern Central Railway Company by the directors.

If the action of the directors of the Northern Central Railway Company was fraudulent or ultra vires it is not denied that a stockholder injured thereby may invoke the aid of a Court of Equity to redress the wrong. The defendants, however, deny any fraud or that the transaction was ultra vires and they also rely upon the defense of laches and acquiescence more than 16 years having elapsed between the date of the transaction now sought to be attacked and the filing of the bill.

While the case must be considered as one of great importance because of the interests and amount of money involved, there are but four main questions which need to be determined by the court, and these are comparatively narrow, viz: First, Was the so-called sale of the stock of the Union Railroad Company to the Philadelphia Wilmington and Baltimore Railroad Company by the directors of the Northern Central Railway Company fraudulent in law or ultra vires? Second, Was the Philadelphia, Wilmington and Baltimore Railroad Company a participant in the illegal act? Third, Is laches or acquiescence a defense to this suit? And fourth, If the plaintiffs are entitled to relief, what is the form that this relief shall take?

The Union Railroad Company of Baltimore was incorporated in 1866, and its line of railway runs from the line of the Northern Central Railway Company at North street in the city of Baltimore east of Union Station, through a tunnel eastwardly and and southerly to tide water at Canton and to a connection with the Baltimore & Sparrows Point Railroad at Colgate Creek. and with a branch running to Bay View Junction on the line of the Philadelphia, Baltimore & Washington Railroad Company. The lines of the Union Railroad Company gives the access and the only access of the Northern Central Railroad Company and the line heretofore belonging to the Baltimore and Potomac Railroad Company to deep water, in or near Baltimore, and its said line is also the connecting link between the line of the former Philadelphia, Wilmington and Baltimore Railroad Company and the former Baltimore & Potomac Roalroad Company and over the line of the Union Railroad Company all through traffic running by the said roads (now consolidated at the Philadelphia, Baltimore & Washington Railroad Company) to and from the cities of New York and Philadelphia and the North and East and from and to the city of Washington and the South must pass.

This physical relationship of the Union Railroad Company with the lines of the Northern Central Railway Company and with the lines of the Philadelphia, Wilmington and Baltimore Railroad Company and the Baltimore and Potomac Railroad Company (now consolidated. as the Philadelphia, Baltimore and Washington Railroad Company) is an important factor in the case. but is not the subject of dispute.

Prior to 1882 the Union Railroad Company was owned and operated by the Canton Company of Baltimore. It had been completed and opened for traffic in 1873. By the terms of its Charter (1870 Ch. 412, Sec. 2) it was provided that:

"All railroad companies shall have the right, upon equal terms, to run their locomotives and cars over the tracks of the said company, and no discrimination in rates of toll, or in any other respect, shall ever be made in favor of any company; provided, that the said Union Railroad Company

shall not charge for the use of the road a sum exceeding the rate of five cents per ton per mile for tolls for use of said road for every mile or proportionate part of a mile, and for passengers a sum not exceeding the rate of ten cents per passenger per mile or proportionate part of a mile for each passenger."

On December 30, 1873, an agreement had been entered into between the Northern Central Railway Company, the Batlmore & Potomac Railroad Co., and the Western Maryland Railroad Company covering the use of the line of the Union Railroad Company by the other companies, as tools therein fixed and in accordance with the rates so established, and a supplemental agreement dated May 1, 1875, the line of the Union Railroad Company was used by these companies and the Philadelphia, Wilmington and Baltimore Railroad Company until the purchase of its stock from the Canton Company in 1881-82. These agreements, the defendants say, were considered fair and proper when made, but as the traffic over the Union Railroad Company, of the Northern Central Railway Company, the Baltimore & Potomac Railroad Company and the Philadelphia Wilmington & Baltimore Railroad Company increased, and freight rates received by them became lower, the rate of toll provided by these agreements became very burdensome to them. Inasmuch as it is conceded that much the greater proportion of the traffic of the Union Railroad Co. was contributed by the Northern Central Railway Company, the burden of course bore more heavily upon it than upon the two other companies named. There would naturally seem to have been but three ways of relief; first, to secure a reduction of tolls upon the Union Railroad Company; second, for an independent line to be built to supply the facilities supplied by the Union Railroad Company; third, for the Union Railroad Company to be acquired from the Canton Company by some one or all of the railroads contributing traffic to it, or by some company friendly to them. What efforts were made looking to the reduction of tolls does not appear, although Mr. Newcomer in his letter of December 15, 1881, to Mr. Cassat says he had the opportunity of impressing upon Mr. Brooks "that no concession in tolls for the use of the Union Railroad Company no matter how great, could ever be made satisfactory." That the construction of an 'independent line was considered is shown, and the probability of its construction was made use of with good purpose, in the negotiations with the Canton Company, to induce the Canton Company to sell the Union Railroad Company for a much less price than it was at first willing to accept. These negotiations began in 1881. At this time the Pennsylvania Railroad Company had lately acquired 90 per cent. of the capital stock of the Philadelphia, Wilmington & Baltimore Railroad Company, and it had since 1873 owned sufficient stock of the Northern Central Railway Company to give it practical control of that company, and it owned also practically all the capital stock of the Baltimore & Potomac Railroad Co. On November 18, 1881, George C. Wilkins, superintendent of the Baltimore Division of the Northern Central Railway Company (and also general superintendent of the Baltimore & Potomac Railroad Company), wrote under date of November 18, 1881, to Frank Thomson, then general manager of the Pennsylvania Railroad Company, the Northern Central Railroad Company, the Philadelphia, Wilmington & Baltimore Railroad Company and the Baltimore and Potomac Railroad Company, suggesting the purchase of the Union Railroad Company as an alternative to the building of an independent line. Negotiations were taken up between Benjamin F. Newcomer, then and for many years before, a director in the Northern Central Railway Company and chairman of the Finance Committee, and who became on the 9th day of January, 1882, a director in the Philadelphia, Wilmington & Baltimore Railroad Company, and Walter B. Brooks, the president of the Canton Company, and resulted in an agreement being executed between the Canton Company and the Northern Central Railway Company, dated February 14, 1882, for the purchase of all (6,000 shares) of the stock of the Union Railroad Company at par $600,000.00, subject to the mortgage debt of $1,500,000.00. The purchase money was all paid by the Northern Central Railway Company by October 9, 1882, the part of it, which was advanced by the Pennsylvania Railroad Company was repaid to it by

the Northern Central Railway Company on September 4, 1882, and the stock was duly transferred to the latter company.

The execution of the contract "for and on behalf" of the Northern Central Railway Company was formally authorized by a resolution of the Board of Directors of that company on the same day the contract was executed. The annual report of the Northern Central Railway Company approved at the same meeting of the Board of Directors, states to the Stockholders of the Northern Central Railway Company:

"Your board deemed it necessary that you should have your own line extending to tide water. For this purpose they had careful surveys and estimates made, the result of which showed that it would be more advisable to acquire the ownership of the present line, if it could be had at a fair price, than to incur the expense and difficulties attending the construction of a new road. Negotiations were accordingly opened on behalf of your company with the Canton Company which resulted in an agreement by which your company purchased the entire capital stock of the Union Railroad Company, amounting to 6,000 shares at its par value of $100 per share, subject to a mortgage indebtedness of $1,500,000 of six per cent. bonds. The gross earnings of the Union Railroad Company for the past year were $287,295.00; expenses, $61,324.00; net earnings, $225,971.00. Of the gross earnings your company paid $254,365.20. As the charges upon the traffic referred to were fixed by the contract, and as the traffic was steadily increasing, it will readily be seen that the purchase of this line must result in a large and direct saving to your company, besides giving it what is essential to its interest—an absolute ownership of a line to tidewater, and a connection with the Philadelphia, Wilmington & Baltimore Railroad Company, now owned and operated in harmony with your system."

The purchase of the Union Railroad Company was a most fortunate one. In the Annual Report of the Northern Central Railway Company for 1882, the following language occurs:

"The Union Railroad was transferred to the management of your

Company, March 1, 1882, and its acquisition has proved even more valuable to your interests than was anticipated, and you cannot be too strongly congratulated on securing its control."

The traffic over its line increased "most surprisingly," "wonderfully," and from its earnings after payment of fixed charges, operating expenses and large sums expended in betterments, it had declared and paid between 1882 and 1894 the following cash dividends:

1882—6 per cent. on $600,000.
1883—6 per cent. on $600,000.
1884—10 per cent. on $600,000.
1885—10 per cent. on $600,000.
1886—10 per cent. on $600,000.
1887—10 per cent. on $1,200,000.
1888—10 per cent. on $1,200,000.
1889—10 per cent. on $1,200,000.
1890—20 per cent. on $1,200,000.
1891—20 per cent. on $1,200,000.
1892—20 per cent. on $1,200,000.
1893—35 per cent. on $1,200,000.

The dividends paid since 1894 seen to confirm the large value of the Union Railroad Company stock at the time of the so-called sale of 5,000 shares of its capital stock by the Northern Central Railway Company to the Philadelphia, Wilmington & Baltimore Railroad Company in that year and to make it appear that the so-called price which was paid for it $100 per share of $500,000, subsequently increased by $50,000, at the time of final settlement, a totally inadequate one, if it was intended to represent the value of the stock in the minds of the parties.

The official record of this transaction in the minutes of the directors of the Philadelphia, Wilmington and Baltimore Railroad Company, and in the minutes of the directors of the Northern Central Railway Company is contained in the following resolutions. The first taken from the minutes of the meeting of the directors of the Philadelphia, Wilmington & Baltimore Railroad Company under date of February 15, 1894, reads:

"Whereas, The Union Railroad of Baltimore is the connecting link between the road of this company on the one hand and the Northern Central Railway and the Baltimore and Potomac Railroad on the other, and it is to

the interest of this company that it should have a proper ownership in the capital stock of the said Union Railroad by reason of its furnishing the most available line, not only for reaching the passenger station in Baltimore, but for a connection with the Southern system of railways; and whereas about 41 per cent. of the business of the Union Railroad is contributed by the interests of this company;

Therefore, Resolved, That the Northern Central Railway Company be requested to sell to the Philadelphia, Wilmington and Baltimore Railroad Company at least $500,000 of the capital stock of said Union Railroad Company of Baltimore at a price not exceeding par."

The resolution passed by the directors of the Northern Central Railway Company on presentation of the above resolution of the directors of the Philadelphia, Wilmington & Baltimore Railroad Company reads:

Resolved, That this company sell to the Philadelphia, Wilmington and Baltimore Railroad Company $500,000 of the capital stock of the Union Railroad Company of Baltimore, being 5,000 shares at par as of January 1, 1894, the purchase money to bear interest at the rate of 6 per cent. per annum until paid.

It will be noted that there is nothing in either of these resolutions to show that the transaction was anything but an offer to buy on the one side and an acceptance of this offer upon the other. There is absolutely no suggestion that the corporation desiring to buy had any interest in the stock or any claim upon the same, either legal or equitable, which the corporation to whom the offer was made was bound to recognize, and when the transaction was reported to the stockholders of the several corporations, we find nothing to indicate anything except a sale and purchase.

The annual Report of the Northern Central Railway Company for 1894 refers to the subject in the following language:

"In order to give the companies contributing traffic to the Union Railroad Company of Baltimore an ownership based upon the amount of such contributions, 5,000 shares of its stock were sold to the Philadelphia, Wilmington and Baltimore Railroad Company."

The annual Report of the Philadelphia, Wilmington & Baltimore Railroad Company says:

"Your Company has acquired by purchase from the Northern Central Railway Company 5,000 shares of the capital stock of the Union Railroad Company of Baltimore."

It is significant that in neither report is the price disclosed, and in no subsequent report or communication to stockholders of either corporation does it appear.

The bill alleges that this so-called sale in view of the fact that the price at which said stock was sold was not proportioned and was not believed or attempted to be proportioned to the real value of the same, was actuated not by a desire to promote the interests of the Northern Central Railway Company, but by an intent to promote at its expense the interests of the Pennsylvania Railroad Company through its subsidiary company, the Philadelphia, Wilmington & Baltimore Railroad Company, and was therefore fraudulent in law and ultra vires.

Recognizing the force of this contention and the inferences that must be drawn from a transaction where the officers and directors of one railroad transferred to another railroad, which had the same officers and some of the same directors, and where both roads were controlled through stock ownership by another railroad, which was much more largely interested in the vendee than the vendor, so valuable an asset, at a manifestly inadequate price, the defendants seek to give to the transaction an entirely different character, and allege that instead of an absolute ownership of the capital stock of the Union Railroad Company, having been acquired at the time of the purchase from the Canton Company in 1882, by the Northern Central Railway Company, this stock was acquired by it at that time and had been held by it down to 1894, in the joint interest of all the roads contributing traffic thereto and particularly in the interest of the Philadelphia, Wilmington & Baltimore Railroad Company, and that the transaction of 1894, resulting in the transfer of 5,000 shares of the stock of the Union Railroad Company to the Philadelphia, Wilmington & Baltimore Railroad Company, was not a sale in which it was

material to consider the value of the stock, but was an apportionment between joint owners or adjustment of the equities between the Northern Central Railway Company and the Philadelphia, Wilmington & Baltimore Railroad Company in the ownership and use of the Union Railroad Company. In the answer of the Philadelphia, Baltimore & Washington Railroad Company this contention is stated as follows:

"This respondent states that in the negotiations and calculations relative to the apportionment of stock to this company by the Northern Central Railway Company, on the first day of January, 1894, the officers and directors of this respondent in no way considered the market price of the stock of the Union Railroad Company, nor did said officers or directors understand that this was, or intend that it should be, a sale of Union Railroad Company stock to it, but intended and understood that such transaction was an apportionment of stock determined and made in the ratio which the traffic of this respondent bore to the whole traffic, passing over the tracks of the Union Railroad, and that such transaction was in conformity with and the outcome of the original agreement between all of the lines constituting and being part of the Pennsylvania Railroad system of lines."

In the answer of the Pennsylvania Railroad Company it is said:

"That it was not a question of sale by one company to the other, nor could there be taken into account the value of the stock to the individual company, it was an apportionment of stock between joint owners in the amount of contributions each of the said owners had given to the common fund and the value to be taken cognizance of, was the value to the two owners as integral units of a vast system of railroads. That the price was a settlement of bookkeeping accounts, of a joint account or a trusteeship."

The answer of the Northern Central Railway Company says:

"That as between this defendant and the Philadelphia, Wilmington and Baltimore Railroad Company, the value of said Union Railroad stock so as aforesaid sold by this defendant to the Philadelphia, Wilmington and Baltimore Railroad Company is entirely irrelevant, inasmuch as the whole of said stock of the Union Railroad Company bought by this defendant from the Canton Company of Baltimore was acquired as well in the interest of the Philadelphia, Wilmington and Baltimore Railroad Company as of this defendant and as hereinbefore set forth, this was at the beginning and always has been recognized."

The first inquiry which naturally suggests itself with reference to the theory that the Northern Central Railway Company held the title to the stock of the Union Railroad Company impressed with a trust in favor of the Philadelphia, Wilmington & Baltimore Railroad Company, and that the transaction of 1894 was a carrying out of this trust, an adjustment of the equities of the parties or an equitable apportionment between joint owners, is why this was not so set forth in the official records, and why it was not so reported to the stockholders of the Northern Central Railway Company. If a trust sufficiently capable of a definite statement existed, and if real intent of the parties was to make a fair and equitable adjustment of equities that would be legal and bear examination, why was it not frankly stated, instead of being concealed under terms "sale" and "purchase."

The existence of the alleged trust is one of the crucial points in the case and I have given careful consideration to the evidence by which it is sought to be supported, and to the exhaustive examination of it in the briefs of counsel, and without rejecting any of the evidence to which exceptions have been interposed, but treating the same as admissible and giving it such probative force as it can properly have, it seems to me the defendants have completely failed to establish any trust or equity in favor of the Philadelphia, Wilmington & Baltimore Railroad Company, which justified the action of the directors of the Northern Central Railway Company in transferring 5,000 shares of stock of the Union Railroad Company to the Philadelphia, Wilmington & Baltimore Railroad Company at what they and the directors of the later road must have known was much less than the fair value.

I can add nothing to the discussion of this subject by the learned counsel in the singularly able briefs which they have filed. Every phase of trust

theory has been exhausted, and the plaintiffs seem to me to have demonstrated that it cannot be sustained.

It is not necessary, and to my mind it would not be proper to characterize the transaction as one tainted with moral wrong-doing on the part of the actors in it. I can readily conceive that as the amount of traffic over the Union Railroad Company, contributed by the Philadelphia, Wilmington & Baltimore Railroad Company, which was small in 1881-82, increased so surprisingly, that the officers of the several roads, particularly those who had been concerned in the purchase of the Union Railroad Company, may have come to believe that the purchase, which was in a sense undoubtedly made "in the interest" of the Philadelphia, Wilmington & Baltimore Railroad Company as well as the Northern Central Railway Company, should have been consummated differently from the way it was consummated, and that an unintentional wrong to the Philadelphia, Wilmington & Baltimore Railroad Company had been done by them in not so consummating it, as they undoubtedly at the time of the purchase had the power to have consummated it, and that it would be equitable and just to do in 1894, what they could originally have done, and would have done had they forseen the future. But what they undertook to do to rectify the mistake that had been made was clearly ultra vires and must be condemned.

It is also apparent that the Philadelphia, Wilmington & Baltimore Railroad Company was a participant in this wrong and cannot be regarded merely as an innocent vendee.

Are the defendants barred of relief by laches and acquiescence?

The defendants insist that if the transaction now assailed was really open to attack it is now too late to question it. They point to the fact that the bill was not filed until more than 16 years had elapsed, that the stockholders had been apprised of the *fact* of the sale shortly before the annual meeting of 1895 and that no inquiry was made until that of the plaintiff Minis at the annual meeting in February, 1910, and no effort to obtain information until the examination of the company's records in October, 1910, preliminary to the bringing of this suit, and they insist that it would be dif-

ficult to suppose a case calling more strictly for the application of the doctrine of acquiescence. They also contend that the bar is applied with all the greater strictness when in the interval as in this case, important witnesses are dead or other important evidence is no longer to be had. While the time which has elapsed in this case is long, mere lapse of time without knowledge of the facts, unless the complainant has been guilty of some negligence in failing to discover the facts, will not bar suit. A stockholder is not bound to suspect ultra vires behind and apparently innocent transaction nor is he chargeable with laches because he fails to exercise his right to inspect the books, even though such inspection would have disclosed the ultra vires act, nor does it seem to be his duty unless he had grounds to suspect wrongdoing in a transaction, to make inquiry of the officers concerning it. As Lord Cranworth has well said, where there was nothing making it the duty of a shareholder to institute any such inquiry, "he has a right to say that the facts if not communicated to him, were concealed from him." Sprackman vs. Evans L. R., 3 H. L., 171, 196.

In this case where the circumstances now alleged to justify the transfer of the stock to the Philadelphia, Wilmington & Baltimore Railroad Company were not only disclosed to the stockholders, but the transaction was reported to them as a sale, they were justified in presuming that the sale was fairly conducted and that the stock had been sold for a fair price. They did not discover the contrary until shortly before the suit was brought, and so far as the death of witnesses is concerned, this should not operate to create a defense, unless there is some fault shown on the part of the plaintiffs, such as purposely delaying the suit until the witnesses had passed away. Whitridge vs. Whitridge, 76 Md., 54, 84, 86.

In my opinion the plaintiffs are not barred of relief on the grounds of laches or acquiescence.

I do not consider it necessary to determine the question whether stockholders who acquired their stock since 1894 can maintain the suit because the plaintiff Minis was a stockholder in 1894, and if any one of the plaintiffs be competent, that is sufficient.

So far as the extent of the relief to be granted is concerned the object of the court should be to place the parties so far as is possible, in the same situation as if the wrongful transaction had not occurred, and I am of the opinion that the decree should give the relief asked for in the first prayer of the bill, except that I am not prepared to direct the amount of money, which upon an accounting shall be found due by the Philadelphia, Baltimore & Washington Railroad Company to the Northern Central Railroad Company to be distributed and paid to the shareholders of the latter.

I am not willing to assume in advance that when the court has condemned the transaction of 1894 and directed the wrong thereby committed to be righted so far as possible, that the officers and agents of the Northern Central Railway Company will not exercise a fair and proper judgment as to the disposition of the money which will be paid to the Northern Central Railroad Company as a result of this suit.

The court costs should be paid by the defendants, except the Union Railroad Company.